UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JAMES K. GARLAND )
)
V. ) NO. 2:10-CV-137
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation, following the denial of his applications for disability insurance benefits and supplemental security income by an Administrative Law Judge [ALJ]. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 10 and 12].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 39 years old at the time of alleged disability onset date, March 15, 2007. He has a high school education. He has past relevant work experience as an inspector, which was unskilled and required light exertion; as a cleaner which was light and unskilled; and as a painter's aid which was medium and unskilled.

He has, as found by the ALJ both a severe mental and physical impairment. His mental impairment is schizoaffective disorder. His physical impairment is status-post lumbar laminectomy.

Plaintiff's medical history is summarized in his brief as follows:

> The Plaintiff has suffered from emotional problems for most of his adult life. In 1995, he was diagnosed as suffering from major depressive disorder severe with psychotic features (TR 239). He was admitted to Woodridge Hospital (TR 240). The Plaintiff was again hospitalized in Woodridge in December 1995 and was diagnosed as suffering from chronic schizophrenia, paranoid type. He also had polysubstance abuse in remission and a personality disorder (TR 252). In May 1997, he was complaining of hearing voices and people talking to him and he was very paranoid (TR 269). In April 1998, it was noted that he had started hearing voices and having mood swings and felt more depressed. He also had hypermanic episodes but the medication was helping (TR 278). In 2001, he admitted to auditory hallucinations but denied delusions and paranoia (TR 282).
> In July 2002, the Plaintiff came under the care of Dr. Kenneth K. Greenwood, a psychiatrist. In August 2002, Dr. Greenwood noted that the Plaintiff continued to work 12 hour shifts but continued to wake up tired and to feel sluggish and he again diagnosed schizoaffective disorder (TR 286).
> In May 2003, the Plaintiff was not having hallucinations but did have a slight delusional content and paranoid ideation (TR 287). In May 2003, the Plaintiff began having tingling sensations on the left side of his head and sharp pains in his left shoulder (TR 288). He also told Dr. Greenwood he was having trouble at work and he thought that people were looking at him (TR 289). In January 2004, he reported

that he was still troubled by intrusive thoughts and would not even go to the restroom because he was afraid of walking past other people. He was hearing voices (TR 295). In May 2005, the Plaintiff was working effectively but still had difficulty with his reactions to some of his coworkers (TR 300). In June 2006, the Plaintiff was having difficulty in sleeping and was sluggish when he got up. He was functioning at work okay, but it was somewhat still intimidating and anxiety provoking (TR 303). In June 2007, he reported to Dr. Greenwood that he had been laid off (TR 306). Dr. Greenwood was of the opinion that the Plaintiff's condition might be fixed and thus he would not be approved for disability (TR 307). The Plaintiff tried Geodon but it made him too depressed, wiped out and sleepy. He continued to feel very self-conscious (TR 308). The Plaintiff was tried on other medicines (TR 310-311) and he wanted to work (TR 312). In May 2008, it was noted that he had two jobs in the past month and had to quit both because he could not get along with other employees. It was noted that he attempted to work but his mental issues stood in his way (TR 315). In June 2008, it was noted that he was not making progress toward his goal of finding employment and that might not be a reachable goal. He had described symptoms of auditory hallucinations and paranoia and he noted increased levels of paranoia during times of stress (TR 316). It was noted that he had difficulty concentrating on questions to apply for disability (TR 318). In September 2008, the Plaintiff reported using thought stopping techniques and cognitive restructuring to assist him with his paranoid thoughts (TR 326).

Dr. Greenwood completed a mental capacities assessment (dated July 22, 2009) which reported that the Plaintiff had no useful ability to relate to co-workers, deal with the public and a poor ability to deal with work stresses and maintain attention and concentration. He tended to be very suspicious about why changes were made and experienced ego-centric thoughts and was paranoid about changes. He had a seriously limited but not precluded ability to use judgment with the public, and interact with supervisors, and to function independently (TR 382). Dr. Greenwood opined that the Plaintiff had no useful ability to do complex job instructions or to relate predictably in a social situation and a seriously limited ability to follow detailed but not complex job instructions, behave in an emotionally stable manner or demonstrate reliability. His interpersonal interactions were very difficult and he had poor trust. Dr. Greenwood reported that the Plaintiff tried to do a good job but thoughts and concentration got interfered with. He felt very self-conscious and paranoid at work during break time or even out shopping (TR 384).

The Plaintiff continued to be followed by Frontier Health. In August 2008, it was noted that the Plaintiff continued to be paranoid and to hear voices during times of stress (TR 397). In November 2008, the Plaintiff continued to report symptoms of paranoid and auditory hallucinations during times of stress (TR 392). In January 2009, the Plaintiff was going out very little and his paranoid and auditory hallucinations increased when he was in stressful situations (TR 391). In June 2009, Dr. Greenwood noted that the Plaintiff had an affect that was restricted to average in intensity and range but was not labile (TR 386).

The Plaintiff was admitted to the Johnson City Medical Center in April 2009

3

for a fever and possible sepsis as well as altered mental status (TR 378). He underwent an incision and drainage of the epidural abscess in the lower back. He was diagnosed as suffering from MSSA bacteremia and sepsis, generalized deconditioning and fluctuation in mental status (TR 352). The Plaintiff returned to his neurosurgeon, Dr. Steven Hamel, in May 2009 and it was noted that he could stand and walk approximately 10 feet but needed the aid of a walker to do so (TR 377). An MRI in May 2009, looked worse to Dr. Hamel and he noted there might be some other bug growing in his back where the antibiotic was not getting into the vertebra (TR 376). In July, 2009, Dr. Hamel noted that the Plaintiff continued to have significant right leg pain and wanted to wait until all the infection was completely cleared before there was any intervention (TR 375).

[Doc. 11, pgs. 2-5].

Plaintiff omitted from his recap of the evidence the assessment of State Agency psychologist Dr. George Davis dated October 8, 2008. Dr. Davis, after reviewing the plaintiff's records, opined that the plaintiff had moderate limitations in his ability to understand and remember detailed instructions, in his ability to carry out detailed instructions, in his ability to maintain attention and concentration for extended periods, in his ability to work in coordination with or proximity to others without being distracted by them, in his ability to complete a normal workday and workweek without interruption from psychological symptoms and to perform at a consistent pace, in his ability to interact appropriately with the general public, in his ability to get along with coworkers or peers, and in his ability to respond appropriately to changes in the work setting [Tr. 342-43]. In the functional capacity portion of the form, Dr. Davis stated that the plaintiff "can do simple, low-level detailed tasks, however, claimant may have some but not substantial difficulty at times." Dr. Davis stated that the plaintiff could attend to these tasks with concentration, persistence and pace, but he "may have difficulty at times." He opined plaintiff could "interact appropriately with peers, supervisors, co-workers and general public, however may have some difficulty at times."

4

Finally, Dr. Davis stated that plaintiff could "respond to changes/hazards in work setting, use public transport, travel to unfamiliar areas and set realistic goals, however, may have some but not substantial difficulty at times." [Tr. 344].

At the administrative hearing, the ALJ called Donna Bardsley as a Vocational Expert ["VE"]. After questioning her about the plaintiff's past relevant jobs, he asked her a series of hypothetical questions. He asked first to assume a person of the plaintiff's age, educational background and work experience. He said "[T]his person could do heavy work, unskilled, better with things than people, and basically with minimal contact with anybody at all." When asked if there would be jobs, Ms. Bardsley identified general laborers, cleaners, stock clerks, food service related occupations and packagers. She stated there would be 7,500 regional jobs and eight and a half million jobs in the national economy. When asked if there would be jobs for a person with the same restrictions but limited to medium work, she stated there would be 9,000 in the region and 10 million in the nation. At the light level, there would be 10,000 regional jobs and 11 million in the nation.[1] At the sedentary level, there would be 1,000 regional and one million nationally available jobs. If the plaintiff were limited to the extent to which he testified at the hearing, there would be no jobs which he could perform [Tr. 33-35].

Counsel for the plaintiff then attempted to cross examine the VE regarding the effect the assessment of State Agency psychologist Davis, *supra*, would have upon the number of jobs. What transpired was, for the most part, several pages of argumentative dialog between

---

[1] It seems odd that the number of jobs would increase as the exertion capacity of the hypothetical individual decreases. It would seem that a person capable of "heavy" work could also perform the "medium" and "light" jobs, which exist in even greater numbers.

the ALJ and counsel. In large measure, this "rhubarb" was caused by a misunderstanding on the part of plaintiff's counsel of the function of the Mental Residual Functional Capacity Assessment form, and its overall "design." Ultimately, Ms. Bardsley stated that if the entire assessment, including Part III, the "Functional Capacity Assessment," was considered as a whole, it would not change the number of jobs identified in her response to the ALJ's hypotheticals [Tr. 39]. After further discourse, Ms. Bardsley stated that if the *only* portion of Dr. Davis's assessment that she could consider were the eight areas in which plaintiff had a "moderate" limitation of function, "a combination could affect all jobs." [Tr. 41]. This will be addressed in greater detail hereinafter.

In his hearing decision, the ALJ found that the plaintiff had a severe mental impairment of schizoaffective disorder and a severe physical impairment of being status-post lumbar laminectomy [Tr. 13]. The ALJ found that the plaintiff had the residual functional capacity to lift and/or carry up to 25 pounds frequently and 50 pounds occasionally, to stand and/or walk for up to 6 hours in an eight hour workday, and to sit for up to 6 hours in an eight hour workday. He also found "he is to avoid more than minimal interpersonal contact in an object-focused environment." [Tr. 15].

While he felt that Dr. Greenwoods assessment came at a time "after the claimant's mental functioning had deteriorated due to unemployment," the ALJ found that "the assessment of Dr. Greenwood was reasonably consistent with the weight of the medical evidence of record..." and gave it "considerable weight in assigning the claimant's residual functional capacity." [Tr. 16].

The ALJ found that with his mental limitations, he could not return to any of his past

jobs [Tr. 17]. However, based upon Ms. Bardsley's testimony, he found the plaintiff could perform a substantial number of jobs in the national economy. Accordingly, the plaintiff was found to be "not disabled." [Tr. 18].

As an initial matter, the Court will further address the intense discussion which took place between the ALJ and plaintiff's able counsel when he attempted to question the VE. Counsel was attempting to dissect the Mental Residual Functional Capacity Assessment [Tr. 342-44] of Dr. Davis, and elicit an answer from Ms. Bardsley based solely upon the eight areas of "moderate" limitations set out in Part I, the "Summary Conclusions" portion of the form. This form is not designed to be completed by the State Agency psychologists for use in this way.

The form consists of three parts. In Part I, the Summary Conclusions, the State Agency psychologist or psychiatrist is to "record summary conclusions derived from the evidence in file...." with respect to the four areas of mental functioning which affect the capacity to work. These are "understanding and memory," "sustained concentration and persistence," " social interaction," and "adaptation." However, the form instructs the doctor that "detailed explanation of the degree of limitation for each category (A through D), as well as any other assessment information you deem appropriate, is to be recorded in Section III (Functional Capacity Assessment)." [Tr. 342].

Part II of the form, entitled "Remarks," is only to be filed out if the evaluator does not have sufficient documentation to perform the assessment. In this case, as in most, this portion was left blank. [Tr. 343]. Part III of the form, the Functional Capacity Assessment, is to be completed "only after the Summary Conclusions section has been completed." In it, the

evaluator is to "explain [his or her] summary conclusions in narrative form." [Tr. 344].

The Social Security Program Operations Manual System ["POMS"] states that the summary conclusions, Section I of the assessment form, "is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." POMS DI 24510.060, found at secure.ssa.gov/poms.nfs/Inx/0424510060. This directive goes on to state that Section III, the Functional Capcity Assessment is "the actual mental RFC...explaining the conclusions indicated in Section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings." Thus, Section I is used by the evaluating mental health professional to note the *existence* of a limitation in some area of functioning. The *degree* to which this limitation affects the ability to work is to be described, or "explained" if you will, in Section III. Thus, Section III "trumps" Section I. Of course, if the findings in Section III were totally at odds with Section I, this would detract from the value of the opinion expressed. However, all that Dr. Davis does here is set forth his opinion regarding the degrees to which the functional problems plaintiff experiences affect his ability to work.

Accordingly, the ALJ was not unfairly limiting the right of counsel to cross examine the VE, but was attempting to make sure that form was considered by the VE according to its purpose and design. The State Agency psychologist rated the degree of limitation in Section III. That was his job, and as the VE realized, it was her job to make a vocational assessment of jobs plaintiff could perform based upon that degree of limitation.

Plaintiff asserts that the ALJ did not properly evaluate the opinion of Dr. Greenwood,

the treating psychiatrist. Plaintiff states that Dr. Greenwood's assessment indicates no useful residual functional capacity for any work, and that Dr. Greenwood's asserted limitations would cause plaintiff to be much limited than could be accommodated by limiting his interpersonal interaction and limiting him to object based work. Thus, plaintiff argues that the ALJ's residual functional capacity determination lacks substantial evidence. As a treating physician, Dr. Greenwood is entitled to controlling weight. Also, plaintiff asserts that the State Agency psychologist opined more serious limitations than those found by the ALJ. Plaintiff also states that the impact of the plaintiff's physical impairment was uncertain at the time of the ALJ's decision and was not taken into account in his RFC determination.

Regarding the plaintiff's physical impairment, his back problem was certainly not the focus of his claim or his testimony at the hearing. He admitted that standing and walking were "okay," as was lifting weight. He admitted that was pursuing benefits based upon his mental impairment. [Tr. 30]. Given the vast numbers of jobs identified at all exertional levels, this case does not turn upon the continuing effects of any physical impairment.

Dr. Greenwood has treated the plaintiff since 2002 on a consistent basis. Indeed plaintiff was hospitalized and treated for his mental problems for several years before that. His treatment has been more or less continuous since 1995 [Tr. 236-327, 225-35, 382-97]. Plaintiff worked for several years prior to his disability onset date while undergoing this treatment. Thus, this is not a case where person sees a psychiatrist a couple of times over a couple of weeks and the psychiatrist produces an assessment based totally on the person's subjective complaints. This is a long term doctor-patient relationship, and as the ALJ observed, Dr. Greenwood's opinion is entitled to great weight.

The first assessment form completed by Dr. Greenwood, in October of 2008, basically listed Dr. Greenewood's diagnosis and the degree of impairment noted in various areas of mental functioning [Tr. 236-37]. It is notable for indicating an anxious mood, slowed psychomotor disturbance, current hallucinations/delusions, and poor interactions with others. Interestingly, Dr. Greenwood at that time opined that the plaintiff was not capable of managing his own funds [Tr. 238].

The more detailed assessment was completed July 22, 2009 [Tr. 382-84]. Doctor Greenwood opined that the plaintiff's ability to relate to co-workers and deal with the public was "none" which the form defined as "no useful ability to function in this area." His ability to deal with work stresses and to maintain attention and concentration was listed as "poor," which the form also defines as "no useful ability to function in this area." His ability to use judgment with the public, interact with supervisors and to function independently was "fair" which is defined as "the ability to function in this area is seriously limited, but not precluded." In explanation of his findings in support of these, Dr. Greenwood stated that the plaintiff "tends to be very suspicious about why changes are made and experiences ego-centric thoughts and paranoia about changes." [Tr. 382].

With respect to the plaintiff's ability to understand, remember and carry out complex job instructions, Dr. Greenwood again stated the plaintiff had a "poor/none" ability. His ability to deal with detailed, but not complex job instructions was "fair." Dr. Greenwood based this upon plaintiff having "intrusive thought and frequent worries/anxiety." His ability relate predictably in social situations was rated as "poor." His abilities to behave in an emotionally stable manner and to demonstrate reliability were rated as "fair." Dr. Greenwood

10

opined plaintiff's "interactions are very difficult; poor trust; interpersonal with paranoia. He tries to do good job but thoughts and concentration get interfered with." He stated also that plaintiff "feels very self conscious and paranoid, at work or during break time, or even out shopping." Dr. Greenwood, this time, opined that plaintiff could manage his own funds. [Tr. 384].

The ALJ gave Dr. Greenwood's assessment great weight and found it consistent with the evidence of record. To that end, he included in the plaintiff's RFC restrictions from having "more than minimal interpersonal contact in an object-focused work environment."

The ALJ chose not to have a consultative mental examination.

In the opinion of the Court, the ALJ's finding of residual functional capacity does not address the plaintiff having "no useful ability to function" regarding dealing with work stresses, maintaining attention and concentration, and relating predictably in social situations. These extreme restrictions would appear to be present in any job, whether there was "interpersonal contact" and even if the work was limited to focusing on objects alone.

The Court has read every treatment note by Dr. Greenwood and all other mental health professionals who treated the plaintiff. The restrictions opined in Dr. Greenwood's assessment arguably seem extreme. However, that is not the issue and it is not the Court's job to weigh the evidence. That is the ALJ's and he has weighed it in favor of Dr. Greenwood's findings. However, it is the task of the Court to see if substantial evidence supports the ALJ's findings of RFC and his questions to the VE. Respectfully, it does not. One cannot circumvent the favoritism toward the weight to be given to a well-supported opinion from a treating source by agreeing with it and then not incorporating the restrictions it contains. The

Court finds that the position of the Commissioner in this case and under these facts was not substantially justified.

Dr. Greenwood, the only examining source, has imposed greater limitations than those found by the ALJ. However, there is enough disparity between the treatment notes and the stark assessment to call into question the propriety of an award of benefits based on the record as it now stands. There are legitimate grounds to believe that the plaintiff may not be so limited by his mental impairment as to preclude all substantial gainful activity. For that reason, the Court recommends that the case be remanded for a consultative mental evaluation and another hearing before the ALJ. Therefore, it is RESPECTFULLY RECOMMENDED that the plaintiff's Motion for Judgment on the Pleadings [Doc. 10] be GRANTED to that extent, and that the Motion for Summary Judgment [Doc. 12] of the defendant Commissioner be DENIED.[2]

Respectfully submitted:

  s/ Dennis H. Inman
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).